**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3140-15T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

EWART M. GUILLETTE,

    Defendant-Appellant.

_____

Submitted January 9, 2019 – Decided August 5, 2019

Before Judges Nugent, Reisner and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 11-02-0188.

Joseph E. Krakora, Public Defender, attorney for appellant (Michael James Confusione, Designated Counsel, on the brief).

Michael A. Monahan, Acting Union County Prosecutor, attorney for respondent (Meredith L. Balo, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Convicted of first-degree murder, weapons offenses, and other crimes for shooting and killing his wife in front of their two young children, defendant, Ewart Guillette, appeals, seeking a new trial or, alternatively, a new sentence. He argues that the following alleged errors deprived him of a fair trial. First, pretrial, the court denied his motions to suppress evidence, dismiss the indictment, and dismiss the jury panel during voir dire. Next, during trial, the jury allegedly heard improper evidence of other wrongs when a witness testified about services provided to the victim by the YMCA, and the trial court infringed on his constitutional right to be present at trial and to testify. Last, in its charge, the trial judge did not instruct the jury on lesser-included offenses of passion-provocation and aggravated manslaughter. Defendant also contends his sentence is excessive. Finding no merit in defendant's arguments, we affirm.

I.

A.

A Union County grand jury charged defendant in a nine-count indictment with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2) (count one); two counts of second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (counts two and three); two counts of second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (counts four and five); two counts

of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) (counts six and seven); fourth-degree false reports to law enforcement authorities, N.J.S.A. 2C:28-4 (count eight); and fourth-degree contempt, N.J.S.A. 2C:29-9(b) (count nine). Following the indictment, defendant moved, unsuccessfully, to suppress information concerning his cellular phone's location and to dismiss the indictment.

A jury convicted defendant on the indictment's first eight counts and thereafter on the ninth count, which had been bifurcated. Two months later, after merging certain counts, the trial judge sentenced defendant to the following terms: life in prison, followed by ten years of parole supervision on the first-degree murder conviction (count one); a consecutive ten-year prison term on count six and another consecutive ten-year prison term on count seven; concurrent seven-year prison terms on counts three, four, and five; and concurrent one-year prison terms on counts eight and nine. This appeal followed.

### B.

The State presented the following evidence at trial. When defendant and his wife, Stacey, separated in the summer of 2010, Stacey and their children, a son, age eight, and a daughter, age six, moved out of their Hillside home. In

August, defendant reported to Hillside police officer Gregorio Menza that he believed Stacey had stolen two of his guns, a Glock Model 22 and a Smith & Wesson. Four days later, Stacey was shot to death in front of an Elizabeth YMCA. According to a ballistics expert, shell casings ejected from the Glock and Smith & Wesson were found at the homicide scene.

On the day of the homicide, Stacey and the children spent the day with her sister. Her sister testified that Stacey and the children left at approximately 8:00 p.m. to return to the YMCA on East Jersey Avenue in Elizabeth. The YMCA's executive director testified the YMCA provides various services to individuals, including "services to survivors of domestic violence," and confirmed that Stacey and the children were receiving unspecified "services" in August 2010.

Defendant and Stacey's son testified that when he, his mother, and sister arrived at the YMCA on the evening of August 30, 2010, he and his sister walked up the stairs, rang the doorbell to be let in, and then waited at the top of the steps while Stacey parked the car. As Stacey walked toward the YMCA stairs, her son saw defendant walk toward her from a "dark area" of the sidewalk. The child said, "Hi, Dad." Defendant grabbed Stacey's arm and said "[g]et in the fucking car." When Stacey refused, defendant pushed her up the stairs. The

4

children "ran down the stairs" because they "didn't want to interfere with the problem that was coming up" and wanted "to stay away" from their parents.

The child continued with his testimony. He said defendant shoved Stacey into a corner at the top of the steps, pulled a gun from his waistband, and began shooting her, while she screamed and told him to stop. The child heard five shots, and he and his sister fled down East Jersey Street, fearing they would be shot.

A woman who had stopped for a red light on East Jersey Avenue testified she watched as a man wearing a white t-shirt and jeans, who matched defendant's description, "cornered" a woman on the YMCA landing. The witness heard the woman scream "no" to defendant and then "go" to two young children standing on the sidewalk. The witness saw defendant, who had a "blank look on his face," shoot the woman several times with a silver handgun, pause, and then resume shooting. The victim tried to block the shots with a black pocketbook or duffel bag.

A second witness who also had stopped at the light on East Jersey Avenue testified he heard a woman scream and saw a man matching defendant's description pull a black gun from his waistband, extend his arm, and fire the gun

5

at the woman. The second witness heard four gunshots, a "clicking sound" as if the "gun jammed," and five more gunshots.

Elizabeth police officer Edward Pinkevicz responded to a call of "shots fired" at the YMCA. Upon arrival he observed Stacey, unconscious and unresponsive, lying at the bottom of the YMCA steps, her clothes bloodstained, and blood around her body. He called for an ambulance and secured the area. Stacey was transported to the hospital where she was pronounced dead at 8:56 p.m.

Elizabeth police officer Roger Alves met with the children inside the YMCA. He described them as "excited[,] scared, [and] crying." He asked the children what happened, and Stacey's son said "daddy shot mommy," gesturing "with his right hand as [if] he was firing a gun." The child described the gun as silver with a "dragon on it." Alves then asked, "where is daddy," and the child told him defendant had "left in his Infiniti."

At approximately the same time, Union County Prosecutor's Detective Michael Manochio watched a surveillance video from the YMCA. He testified the video showed the following:[1]

---

[1] The surveillance video was played for the jury, without objection, but has not been provided to us as part of the appellate record.

> An individual approaching the victim on the staircase with the two children. A brief argument ensued and eventually the suspect, described on the video, pulled out a weapon, [and] started shooting the victim numerous times. As the victim was trying to pull away from the suspect, the suspect pulled out a second weapon and continued to shoot the victim.

Pinkevicz broadcast a description of defendant and the vehicle registered to him – a 2010 black Infiniti SUV.

Detectives searched the shooting scene and found projectiles and spent shell casings, a black purse with a bullet hole through it and a spent projectile inside it, and a white shopping bag, which appeared to be spotted with blood splatter. Other detectives were dispatched to defendant's Hillside home, but found neither defendant nor his car there.

Meanwhile, Manochio learned defendant had applied for a permit to purchase, but not to carry, the Glock and the Smith & Wesson he had previously reported stolen. Defendant had listed his cellular phone number on the permit application. Manochio requested an emergent ping order from Verizon for defendant's cellphone location. Verizon personnel responded that defendant's cellphone had been located in the area of a specific address on Penrose Avenue in Philadelphia, Pennsylvania.

A-3140-15T3

Union County Prosecutor's detective Kevin Grimmer contacted the Philadelphia Homicide Unit at approximately 2:55 a.m. and requested assistance with his investigation. Philadelphia homicide detectives, who were familiar with the Penrose Avenue area, informed Grimmer a hotel was located in the area and that it was close to the airport. A Philadelphia Detective, Joseph Bamburski, drove to the hotel's parking lot and found a black Infiniti with a New Jersey license plate registered to defendant. Bamburski and his partner entered the hotel and spoke to the hotel clerk, who informed them defendant had checked in at 12:56 a.m. and was in room 205. The Detectives relayed the information to the Union County Prosecutor's Office and set up a surveillance of the hotel exits.

Meanwhile, another Philadelphia detective, Howard Peterman, obtained a warrant to search defendant's hotel room. A Philadelphia S.W.A.T. team entered defendant's room to execute the search warrant, found defendant in bed, and handcuffed and arrested him.

Manochio and Grimmer, who had traveled to Philadelphia from New Jersey, entered defendant's hotel room and found three weapons on the nightstand, a black suitcase containing clothes, a bag containing $5676 in cash, a laptop, a cellphone, a white t-shirt with a Polo logo, blue jeans, and tan boots, appearing to have blood on them. A forensic expert testified the blood on the

8

jeans matched a sample of Stacey's blood, and Stacey could not be excluded as a source for the blood on the right boot.

The three seized weapons, which contained live ammunition, were a Glock Model 27 semi-automatic handgun and the two guns defendant had reported stolen. The Smith & Wesson had a dragon on the handle. Later, law enforcement officers executed a search warrant for defendant's Infiniti and found a fourth weapon, a .45 caliber semi-automatic handgun and ammunition.

A ballistics expert testified that ballistics tests confirmed the three guns found in the hotel room and the gun found in defendant's car were operable. He also testified that ballistic tests confirmed the cartridge casings found at the scene had been fired from the guns defendant had reported stolen.

Dr. Junaid Shaikh, the Medical Examiner at the time of trial, testified that Dr. Zhongxue Hua, former County Medical Examiner, had performed an autopsy on Stacey. Stacey had sixteen gunshot wounds to her chest, abdomen, back, hip, forearms and elbow, which resulted in injuries to her lungs, pericardial sac, aorta, liver, abdomen, and large bowel. Shaikh, who had formed her own independent conclusion based on her review of the autopsy results, testified the cause of death was "multiple gunshot wounds through the torso [a]nd extremities" [a]nd the manner of death was homicide.

## II.

On appeal, defendant argues the following points:

> Point 1.    The trial court erred in denying defendant's motion to suppress.
>
> Point 2.    The trial court erred in denying defendant's motion to dismiss the indictment.
>
> Point 3.    The trial court infringed defendant's right to a fair jury by denying defendant's motion to dismiss the jury panel during voir dire.
>
> Point 4.    Improper other wrongs evidence infected the jury trial.
>
> Point 5.    The trial court infringed defendant's right to testify on his own behalf.
>
> Point 6.    The trial court erred in denying passion-provocation, and aggravated and reckless manslaughter, as lesser offenses for the jury's consideration.
>
> Point 7.    Defendant's sentence is improper and excessive.

Except for the comments that follow, we find defendant's arguments in points two, four, and six devoid of sufficient merit to warrant discussion. R. 2:11-3(e)(2).

## A.

Defendant argues in point two that the judge erred in denying his motion

10

to dismiss the indictment because: 1) the prosecutor failed to inform the assignment judge, in accordance with Rule 3:6-3(a), that two grand jurors had prior knowledge of the case; and 2) the prosecutor expressed personal views and influenced the grand jurors by reading a proposed form of the indictment.

The record discloses that two grand jurors raised their hands in response to the question, "[d]oes anyone recollect reading anything in the newspaper or seeing anything on television about it?"  The prosecutor separately questioned each juror in the clerk's office.  Each had read a newspaper article about the case.  One recalled the article "[n]ot clearly, just vaguely," the other in more detail.  Both said they could be fair and impartial and could make a decision based on the evidence.

During argument on the motion to dismiss, the prosecutor explained that the Assignment Judge was contacted and "obviously then made the determination that its fine to proceed with those grand jurors.  They were not excused.  And that's why we proceeded back [onto] the record[.]"  According to the prosecutor, had the Assignment Judge ordered recusal, the clerk would have noted the record accordingly.

Defendant also argues the assistant prosecutor misled the grand jury by reading to them the proposed indictment before presenting evidence.  In denying

the motion, the trial judge explained, "it's clear from the presentation that the indictment was being presented for the grand jury's consideration, that it was a proposed form of indictment, and that ultimately it was the grand jurors' decision whether to return a true bill or not."  The trial judge did not abuse his discretion in so finding.  State v. Hogan, 144 N.J. 228-29 (1996).  Moreover,

> the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.
>
> [United States v. Mechanik, 475 U.S. 66, 70 (1986); see also State v. Ball, 268 N.J. Super. 72, 120 (App. Div. 1993).]

Accordingly, we reject the argument the trial judge erred by denying defendant's motion to dismiss the indictment.

### B.

In his fourth point, defendant argues he was deprived of a fair trial because the executive director of the YWCA "mention[ed]" the terms "domestic violence" and "shelter" on direct examination.  When asked to describe the services the YMCA offered, the director replied, "[w]e provide counseling, case management, [and] advocacy.  We have an attorney there.  We provide services

to survivors of domestic violence." She said she was aware the YMCA was providing services to defendant's wife, but she did not specify the nature of the services. The record does not reflect that the director used the term "shelter."

Even if the director's testimony could be construed as accusing defendant of other wrongs – and we do not conclude it does – given the overwhelming evidence of defendant's guilt, any error was harmless. R. 2:10-2.

## C.

Similarly, we reject defendant's argument in his sixth point that the trial judge erred by not charging the jury on passion-provocation manslaughter, aggravated manslaughter, or reckless manslaughter. A thorough examination of the record reveals no rational basis for an instruction on any manslaughter offense. See State v. Alexander, 233 N.J. 132, 142 (2018). Defendant repeatedly shot the victim at close range, at one point stopping and then resuming, after she begged him to stop. There is no evidence of provocation and no evidence to support a manslaughter charge.

## III.

We next address defendant's first point, namely, the trial judge erred by denying his suppression motion. Defendant argues that under the New Jersey Wiretapping and Electronic Surveillance Control Act, N.J.S.A. 2A:156A-1 to -

37 (the Wiretap Act), absent a cell-phone owner's consent, the police were required to obtain a court order or warrant before seeking cell-phone location information (CPLI) for defendant's phone, N.J.S.A. 2A:156A-29, and no exigent circumstances existed to justify the warrantless search of the CPLI.

The State concedes it did not obtain a court order or warrant before obtaining defendant's CPLI. The State does not contend its pursuit of defendant fell within a statutory exception to the Wiretap Act's requirement of a warrant or court order. Rather, the State contends exigent circumstances justified the action taken by detectives. We must thus decide whether an exception to the warrant requirement justified the police action. We conclude, as did the trial court, that exigent circumstances justified the police in obtaining defendant's CPLI without a court order or warrant.

Article I, Paragraph 7 of the New Jersey Constitution protects an individual's privacy interest in CPLI. State v. Earls, 214 N.J. 564, 588 (2013).[2] Thus, to obtain CPLI from cell-phone providers, law enforcement officials are

---

[2] The Fourth Amendment protects one's "legitimate expectation of privacy in the record of his physical movements as captured through [CPLI]." Carpenter v. United States, ____ U.S. ____, ____, 138 S. Ct. 2206, 2217 (2018). The United States Supreme Court has yet to decide whether real-time CPLI or only records of historic CPLI are protected. 138 S. Ct. at 2220.

A-3140-15T3

required to obtain "a warrant issued by a neutral magistrate and supported by probable cause." Id. at 589. However, "no warrant is required in emergency situations or when some other exception to the warrant requirement applies." Ibid.

The Supreme Court applied its holding in Earls to defendant Earls and future cases only. "For prior cases, the requirement in place at the time an investigation was conducted remains in effect." Id. at 591. "Starting January 12, 2010, law enforcement officials had to obtain a court order to get cell-site information under N.J.S.A. 2A:156A-29(e)." Ibid.

Thus, in August 2010, the month this homicide occurred, the Wiretap Act required law enforcement officers to obtain consent, a warrant, or a court order to get CPLI, except when the officers believed in good faith they were faced with an emergency involving danger of death or serious bodily injury to the subscriber or customer whose information was sought. N.J.S.A. 2A:156A-29(c). The statutory remedy for the failure to obtain a wiretap order for CPLI was not, however, exclusionary.

The Wiretap Act provides that "[a]ny aggrieved person in any trial, hearing, or proceeding . . . may move to suppress the contents of any intercepted wire, electronic or oral communication, or evidence derived therefrom" on

grounds specified in the statute. N.J.S.A. 2A:156A-21. As the statute states, suppression of evidence is a remedy where "intercepted wire, electronic or oral communication, or evidence derived therefrom," are unlawfully intercepted. Id. "Location information" or "cellular site information," as defined in N.J.S.A. 2A:156A-2(w), is specifically excluded from coverage as an electronic communication, N.J.S.A. 2A:156A-2(m)(3), and is not a wire or oral communication as defined in N.J.S.A. 2A:156A-2(a), (b), or (d), and thus is not subject to suppression under the statutory provisions of the Wiretap Act. Nonetheless, "suppression may be an appropriate judicial remedy to prevent the occurrence of intentional or insolent violations of statutory requirements." State v. Murphy, 148 N.J. Super. 542, 548 (App. Div. 1977). Here, there is no evidence that law enforcement officers acted in "intentional or insolent" disregard of the Wiretap Act.

Moreover, contrary to defendant's argument, exigent circumstances existed to justify law enforcement officers obtaining defendant's CPLI. "[E]xigent circumstances are present when law enforcement officers do not have sufficient time to obtain any form of warrant, because of the immediate and urgent circumstances confronting them." State v. Hathaway, 222 N.J. 453, 468 (2015) (alteration in original) (internal quotations and citation omitted).

> Although "exigent circumstances" cannot be precisely defined or reduced to a neat formula, . . . some factors to be considered in determining whether law enforcement officials faced such circumstances are the urgency of the situation, the time it will take to secure a warrant, the seriousness of the crime under investigation, and the threat that evidence will be destroyed or lost or that the physical well-being of people will be endangered unless immediate action is taken.
>
> [State v. Johnson, 193 N.J. 528, 552–53 (2008).]

Other factors include, the possibility that the suspect is armed and the strength or weakness of the facts establishing probable cause. State v. DeLuca, 325 N.J. Super. 376, 391 (App. Div. 1999), aff'd as modified, 168 N.J. 626 (2001). "[N]o one factor is dispositive and exigency must be assessed on a case-by-case basis under a totality-of-the-circumstances standard." State v. Adkins, 221 N.J. 300, 310 (2015). The United States Supreme Court has noted that exigent circumstances include "the need to pursue a fleeing suspect, protect individuals who are threatened with imminent harm, or prevent the imminent destruction of evidence." Carpenter, 138 S. Ct. at 2208.

Here, based on evidence presented at the suppression hearing, the judge determined the warrantless search of defendant's CPLI was justified under the exigent circumstances exception to the warrant requirement. The evidence the

State presented at the suppression hearing supported the court's factual determinations and legal conclusions.

The detective who testified at the suppression hearing knew defendant's son had not only identified defendant, but told police officers defendant told him and his sister to get into his car immediately following the shooting. Surveillance video confirmed eyewitness accounts of the shooting as well as defendant's identity as the shooter. The detective believed the community was at risk because defendant had fled, armed with two weapons. The detective believed defendant would try to harm either the children or the victim's other family members. The detective also recounted the events resulting in the police obtaining defendant's CPLI and eventually arresting him at the Philadelphia Hotel.

The trial court made the following findings:

> This shooting took place on a busy street in the center of Elizabeth where there was a heavy traffic flow. Defendant was clearly identified as the shooter. The area was searched for guns and no guns were found. I believe that there was a legitimate concern for public safety here and that exigent circumstances exist.
>
> The defendant was armed and dangerous. He had no qualms about shooting his wife in front of his two kids in a heavily traveled area. He tried to lure the kids. He left with the weapons. He had weapons that were licensed. The police knew he had a history of domestic

18

violence situations. There was a legitimate safety concern causing the police to want to apprehend him as soon as possible.

There was concern for the children which, although the police knew were in a safe place, the defendant didn't know that and there was concern that he might come armed looking for the children. There was concern for the victim's family. And there was concern for the public at large. What the police knew at this point in time is that the defendant was armed, dangerous, willing to shoot, and was in a desperate situation.

The defendant knew the location of the victim's family members. There was also some concern that he might have been following or stalking the victim. The victim was coming from her sister's house in Rahway. The defendant knew the victim's family. They didn't know how the defendant knew the victim's location. He seemed to be waiting for her.

Based on all of this, I believe this comes within the exception set forth in [State v. Earls, 214 N.J. 564 (2013),] and, once again, there was legitimate exigent circumstances to make this arrest as soon as possible based on the public safety concerns.

The judge's factual determinations were supported by sufficient credible evidence on the record. State ex rel. J.A., 233 N.J. 432, 445 (2018) (quoting State v. Gonzales, 227 N.J. 77, 101 (2016)). Moreover, the judge's legal conclusions were sound. Accordingly, we reject defendant's argument that the judge erred by denying defendant's suppression motion.

IV.

Defendant contends in his third point that the trial court infringed his right to a fair trial when it denied his motion to dismiss the jury panel during voir dire. Specifically, defendant argues the trial judge's inadvertent mention of the separately-tried contempt charge during voir dire on the other charges denied him a fair trial. We disagree.

Jury selection began on September 15, 2015, but the panel was dismissed on September 22, 2015, after an outburst from defendant. Jury selection began again on September 24, 2015, during which the trial judge informed the group of potential jurors, without objection, that:

> Allegations are not evidence. . . . Allegations are what the State hopes or believes that they will be able to prove during the course of the trial from the evidence. So what I am telling you now is not evidence. It is allegations.
>
> The allegations are that, on or about October 30th, 2010, in the City of Elizabeth, the defendant is alleged to have committed the following crimes:
>
> Murder, possession of a weapon for an unlawful purpose, unlawful possession of a weapon, endangering the welfare of a child, false reports to Law Enforcement Authorities, and contempt.
>
> [Emphasis added].

On September 29, 2015, the judge gave another group of potential jurors an almost identical instruction, including the reference to the contempt charge. On the following day, during voir dire of the prospective jurors, the judge asked juror number 0438 what her reaction was when she first heard the nature of the charges. She said she could not hear the charges and that the only word she "might have heard was shooting[.]" At that point the prosecutor, out of the presence of the juror, told the judge that she "realized yesterday you were reading contempt and that [it] would be a bifurcated trial so we should not reference contempt." The judge agreed and re-read the juror only the eight charges, not the contempt charge.

Defendant moved to discharge the panel based on the court's reference to the bifurcated charge. The judge denied the application, finding that:

> I told [the jury] these are allegations, that they are not evidence. I told them that what's in the indictment is not evidence and . . . I think it's harmless. You think that if anybody thinks that after telling about murder and shooting -- allegedly shooting his wife at close range numerous times in front of the kids that somebody even recalls that I said contempt I think it's totally harmless in the context of this case and the application is denied.

A-3140-15T3

The judge did not mention the contempt charge in addressing the next panel of prospective jurors on September 30, 2015, or during the preliminary instructions.

A trial judge's determination to deny a motion to dismiss the jury panel is reviewed for an abuse of discretion:

> Ultimately, the trial court is in the best position to determine whether the jury has been tainted. That determination requires the trial court to consider the gravity of the extraneous information in relation to the case, the demeanor and credibility of the juror or jurors who were exposed to the extraneous information, and the overall impact of the matter on the fairness of the proceedings.
>
> [State v. R.D., 169 N.J. 559, 559 (2001).]

Here, the trial judge inadvertently referred to the bifurcated charge, however, that error did not call into question the impartiality of the jury. The judge's brief reference to the contempt charge, in the context of this case – where the jury was told that defendant was alleged to have "shot his wife numerous times at close range in the presence of their two small children" – was harmless. R. 2:10-2.

## V.

In his last challenge to his trial, defendant argues the court "infringed [his] right to testify on his own behalf." The record refutes defendant's contention.

Following the pretrial motions, but prior to trial, a psychiatrist examined defendant and concluded that he was competent to stand trial, was malingering, and had engaged in behavior to delay the trial.

Thereafter, defendant chose not to appear during jury selection on September 15, 16, and 17, 2015. He appeared at trial for the first time on September 22, 2015. On that date the court warned defendant, outside the presence of the jury, not to disrupt the proceedings, and then questioned each of the fifteen prospective jurors in the jury box individually, as to whether defendant's presence changed their answers to the jury questionnaire. Despite the warning, defendant blurted out in the presence of the jury panel that "[t]hey're kidnapping me. They're holding me against my will. And the judge he's the Devil. And the prosecutor is . . . part of his army. I just want it on the record." Defendant claimed that "[a] voice told me to do it." The judge granted defense counsel's motion to dismiss the panel, and told defendant that he had forfeited his right to be present in the courtroom.

Thereafter the court arranged for defendant to listen to the proceedings live in a separate room in the courthouse via "Court Smart." Defendant chose to remain in jail and not to listen to portions of the jury selection and the trial.

On October 15, 2015, the fourth day of trial, defendant requested that he be allowed to return to the courtroom. The judge said he was "inclined" to let [defendant] come back in the courtroom, but warned that "[i]f there's any violation of those rules or any outbursts or any disruptions in this trial, you will be precluded from being in the courtroom." Defendant reconsidered and said, "I don't think at this time that I would be able to control my outbursts because, you know, I have these voices to talk to. So I'd rather . . . be upstairs".

On the following day, defendant was "demanding" to be present during his son's testimony, agreed to follow the court's rules, and said he understood that if the court had to admonish him "in any form, way or fashion that he forfeits his right to testify in his own defense," and that the court would not grant a mistrial. In violation of the court rules, defendant spoke directly to E.G. during his testimony. The judge allowed defendant to remain in the courtroom during the remainder of E.G.'s testimony, but after the jury was dismissed, defendant again spoke directly to E.G.

Defendant subsequently represented that he wanted to testify on his own behalf. In response to the court's questions, defendant said that he understood that he would be held in contempt of court if he failed to follow the court's instructions, acted inappropriately, or engaged in any outbursts. Defendant was

24

then escorted to the witness stand.  As the jury entered the room, defendant addressed one of the jurors by name:

> THE DEFENDANT: – how you doing? You from
> – from Hillside, right?
>
> THE COURT:  Mr. Guillette.
>
> THE DEFENDANT: You don't remember me?
>
> THE COURT:  Mr. Guillette.
>
> THE DEFENDANT:  Oh, long time no see. I've
> been locked up the past five years.

The judge dismissed the jurors.  As the jury was exiting the courtroom, defendant claimed that he knew the juror "from Hillside."

The judge allowed the jury to be brought back in so that defendant could start his testimony, but stated for the record that everyone had bent "over backwards to accommodate" defendant's "whims," and that defendant has "come and gone as he pleased," and engaged in conduct to "create appellate issues, delay the trial, and make it as difficult as possible to complete what . . . we're all trying to do here."  The judge again instructed defendant:

> I'm going to tell you again you are not to say anything
> to anyone in this courtroom, not the jurors, not me, not
> the attorneys, not anybody in the audience, you are to
> just answer the questions that are put to you by the
> attorneys unless I sustain the objection.  If there is any
> other conduct that violates any of my rules I will ban

A-3140-15T3

you from the courtroom and we will continue the trial without your testimony. Do you understand?

THE DEFENDANT: Yes, Your Honor.

However, after spelling his name for the record, and before defense counsel asked a single question, defendant, for the second time, directly addressed the jury and said:

THE DEFENDANT: Before we begin I would like to let the jury know –

THE COURT: No.

THE DEFENDANT: – that I've been locked up for five years –

THE COURT: Take the jury out, please.

Defense counsel argued that defendant should be allowed "to continue to exercise his constitutional right and assist in his defense." The judge noted that defendant had, within seconds of the jury entering the courtroom, directly addressed the jury in direct violation of the court's instructions. Nonetheless, after getting assurances that defendant would not speak to the jury, the judge once again allowed him to testify.

When trial resumed, defense counsel asked defendant one question before the following transpired:

Q. Mr. Guillette, did you shoot your wife?

A.  Before we begin I would like to tell the jury to vote –

[PROSECUTOR]:  Your Honor –

THE COURT:  I can't hear you.

[PROSECUTOR]:  – he's now saying before we begin –

THE DEFENDANT:  – not guilty – before we begin, the jury –

[PROSECUTOR]: – he wants to give a speech.

THE DEFENDANT:  – the jury not – not – to vote not guilty.

THE COURT:  Speak into the microphone please.

THE DEFENDANT:  I said before we begin I would [sic] to tell the jury to vote not guilty –

THE COURT:  All right.  Stop.  Take the jury out.

The judge ruled that defendant had waived his right to testify, but could remain in the courtroom.

The judge instructed the jurors that "[a]nything the defendant may have said in open court that you heard is struck from the record and you are not to consider it in any way, shape or form."  The judge then asked the jurors whether there was "anything that happened this morning that would interfere with your

27

ability to be fair and impartial in this case and decide the case solely upon the evidence that you heard in this courtroom."  No hands were raised.

On the following day, defendant blurted out, "I'd like to let the jury know . . . [h]e's denying me my right to testify[,]" and that "[t]hey're denying me my constitutional right . . . to testify."  The judge ruled that defendant had waived his right to be present in the courtroom.

Defendant returned to the courtroom for sentencing, but after a profanity-laced confrontation with one of Stacey's family members, was briefly escorted to a separate room to watch a portion of the proceedings on Court Smart, and was then allowed to re-enter the courtroom.

An accused's Sixth Amendment rights to be present at every stage of the trial and to confront the accusers is not absolute.  State v. Luna, 193 N.J. 202, 210 (2007).

> [A] defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.
>
> [Illinois v. Allen, 397 U.S. 337, 343 (1970)].

Moreover,

28

[i]t is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations. We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant . . . . : (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly.

[Id. at 343–44.]

"Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings." Id. at 343. Trial judges are afforded "sufficient discretion to meet the circumstances of each case." Ibid.

In State v. Reddy, 137 N.J. Super. 32, 36 (App. Div. 1975), we found no abuse of discretion where the trial judge removed defendant from the courtroom after he engaged in unruly behavior in an effort to disrupt and delay the proceedings and was told that he could return "whenever he was willing to comport himself with courtroom decorum."

The facts in this case are even more compelling. Here, there was ample evidence of defendant's disruptive and disrespectful conduct. The trial judge, who displayed exceptional patience in dealing with defendant, conducted the proceedings properly and in accord with Allen, 397 U.S. at 337. The judge gave defendant every opportunity to be present. The judge gave defendant at least seven explicit warnings that he would be removed from the courtroom if he engaged in disruptive behavior, and permitted him to return to the courtroom on at least four occasions after defendant agreed to comport himself properly. Despite the numerous warnings, defendant continually engaged in disruptive behavior resulting in the dismissal of the first jury panel, and ultimately resulting in a loss of his right to be present in the courtroom. The judge did not abuse his discretion; rather, he exercised it soundly.

## VI.

In his final argument, defendant contends his sentence is excessive. We find no merit in his argument.

We review the sentence the trial judge has imposed under an abuse-of-discretion standard. State v. Miller, 237 N.J. 15, 28 (2019). "[A]ppellate courts are cautioned not to substitute their judgment for those of our sentencing courts." Ibid. (alteration in original) (quoting State v. Case, 220 N.J. 49, 65 (2014)). For

that reason, appellate courts must affirm the sentence unless a trial court has violated the sentencing guidelines, found aggravating or mitigating factors not based on competent and credible evidence in the record, or has applied the guidelines in such a manner as to "make[] the sentence clearly unreasonable so as to shock the judicial conscience." Ibid. (quoting State v. Fuentes, 217 N.J. 57, 70 (2014)).

The judge who sentenced defendant explained, in part:

> You found out where your wife was staying, where your children were staying, and you just set an ambush for them.
>
> In preparation, you gathered your guns, your ammunition, cash, packed a suitcase, and brought them with you to facilitate this massacre, this murder, and then you escaped from it.
>
> You approached your wife and two small children, armed to kill. You trapped her against this door and this banister and then, in the most brutal, cowardly, merciless way, you just continually shot her, over and over and over again.
>
> It's clear from the video, which is, you know, traumatizing to watch, you pulled out your first gun and while your terrified – terrified children were running for their lives, at close range, you fired bullet after bullet into this woman.
>
> The shots were fired were so close range you could see the poor woman's body just shaking from the force of the impact of the bullets, and you just kept doing it

over and over and over again, firing bullet after bullet into this poor, defenseless woman, until the gun was empty.

And somehow she manages to stand up. Where she got the strength to do that after that, I don't know, but she managed to stand up and falls down the steps, and you calmly walk down the steps, stand over her, stand over the dying Stacey Ann, and pull out a gun and start shooting into this poor, defenseless woman over and over and over again. And then you calmly just walk down the street on your way.

The brutality, the viciousness, the cold-bloodedness of this act, it's almost impossible to imagine or accept. It's hard even to come up with the words to describe the level of brutality and intensiveness of this.

And all this done in – in front of your two small young children, with absolutely no regard for their well-being. These children are separate victims of separate criminal acts. This is something that they will have to deal with and will suffer from the rest of their lives.

The record demonstrates the trial judge followed the sentencing guidelines and based his decision concerning aggravating and mitigating factors on competent and credible evidence in the record. The judge also based his imposition of consecutive sentences on adequate evidence on the record. State v. Yarbough, 100 N.J. 627, 640-44 (1985). The sentence falls within the sentencing guidelines, is not clearly unreasonable, and does not shock the judicial conscience. Accordingly, we affirm it.

32

In short, the judge "exercise[d] discretion in accordance with the principles set forth in [New Jersey's Code of Criminal Justice] and defined by [the Supreme Court]," so we may not second-guess-[his] decision. <u>State v. Bieniek</u>, 200 N.J. 601, 607-08 (2010) (internal quotations and citations).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3140-15T3